■ STEPHEN P. BLANK, as Personal Respresentative of LEO BLANK, Deceased, Appellant, v ROBERT BLANK et al., Respondents. [681 NYS2d 377] —Graffeo, J. Appeal from an order of the Supreme Court (Torraca, J.), entered November 3, 1997 in Sullivan County, upon a decision of the court in favor of defendant Robert Blank.

The nonjury trial of this action involved the Sullivan County business dealings of the Blank brothers and their associates spanning several decades. Leo Blank (hereinafter decedent) and his younger brother, defendant Robert Blank (hereinafter defendant), have been embroiled in protracted litigation since 1977 regarding decedent's claims that defendant mismanaged and misappropriated corporate assets. After decedent's death on February 28, 1992, plaintiff was substituted as the personal representative for decedent. Plaintiff seeks a declaration, *inter alia*, of the parties' interests in four closely held corporations.[1] Trial proceedings commenced on January 19, 1988 and concluded on January 7, 1992, prior to decedent's death. Supreme Court dismissed the complaint, declared defendant the sole stockholder of the corporations at issue and found that defendant had not engaged in wrongful conduct toward decedent. Plaintiff appeals.

Before examining the points raised on appeal, a synopsis of the history of corporate formation, adduced from testimony at trial, is necessary since a multitude of transactions underlie the decades of business relationships between the parties. Decedent began building his commercial enterprises in Sullivan County in the 1940s. After World War II, decedent incorporated Sullivan County Building Material Company Inc. with his older brother, Bernard Blank (hereinafter Blank), and defendant Irving Miller, each holding a one-third interest, with decedent serving as president of the corporation. When defendant returned from his service in the Army in 1951, he operated Triangle Service Station, a retail gasoline business situ-

---

**1.** Irving Miller and Ralph Rappaport were originally also named as defendants, but the action against Miller was settled prior to trial and proceedings were stayed against Rappaport so the trial proceeded against only defendant.

ated on premises owned by one of decedent's businesses. In 1952 the first of the subject corporations, County Petroleum Products, Inc. (hereinafter County), was incorporated for the purpose of acquiring a gasoline and home heating oil franchise in Sullivan County. Decedent, defendant, Blank and Milton Levine served as corporate subscribers and officers.

At this juncture in the chronology of events, the parties' testimony diverged into contradictory versions as to the ownership interests and intentions of the parties as their business interests evolved. Decedent claimed that at the time of County's formation, the involved parties agreed that Levine would acquire 25% and decedent, defendant and Blank would share equally the remaining 75%. Defendant contested this ownership allocation and instead apportioned the parties' interests one third to Levine, one third to defendant and the remaining one third to decedent, Blank and Miller. Defendant further claimed that none of these individuals paid for corporate shares. It is undisputed, however, that there was no written shareholder agreement or stock certificates issued.

The parties also disagreed on the original financial obligations of the individuals involved with County's creation. Decedent averred that his contribution to County consisted of his negotiations to secure the franchise, his customer list from another business and a $20,000 loan. In contrast, defendant claimed that each individual was to invest one third of $35,000, the operating capital needed on deposit in order to consummate the franchise purchase. Although he paid his share, defendant stated that decedent's and Levine's contributions to County were withdrawn a day later. County's accountant, defendant Ralph Rappaport, testified that corporate records indicated that almost the entire sum on deposit was thereafter withdrawn from County's account and the accounting records revealed no capital contribution by any of the business owners. Years later, in 1956, Levine received a payment from County, with defendant attributing the payment as moneys paid for legal services rendered while decedent characterized the transaction as a buyout of Levine's ownership interest.

When defendant entered the bottled gas market, another corporation was formed, Premium Gas Service, Inc. (hereinafter Premium), as evidenced by a certificate of incorporation dated December 8, 1953. Benjamin Goldstein, the attorney who handled the incorporation, testified that decedent requested the corporate formation and intended defendant to manage the business. A formal shareholder agreement was executed on March 7, 1954, with defendant and Alan Laskin each owning

50% interest. With the execution of a written buyout agreement in 1958, defendant acquired Laskin's interest in Premium. Decedent, nevertheless, asserted that he was integrally involved in Premium's business dealings and rescued the corporation from its financial problems in 1958, the same year that County's fuel franchise agreement was due to expire. Decedent claimed credit for attracting and negotiating a franchise deal with a new supplier, Esso, which revitalized the fuel business and made County a heating oil distributor and Premium a gasoline agent for Esso in Sullivan County. In contrast to decedent's testimony, defendant alleged that he initiated the early meetings with Esso representatives; although he acknowledged seeking decedent's assistance, defendant insisted that he negotiated the eventual terms of the franchise agreement. The negotiations culminated in two agreements, signed by defendant as president of Premium and County, with a personal guarantee from decedent on behalf of County and a personal guarantee for Premium executed by defendant.

In 1960 another enterprise, Premium Holding Corporation, was renamed Shelley Realty Corporation (hereinafter Shelley), and its purpose was to manage the real estate assets of the fuel and gasoline businesses operated by Premium and County. Again, there was no shareholder agreement or corporate books. Defendant contested decedent's ownership of Shelley, while 1962 accounting records reflected that its 100 shares were allocated 40% to defendant, 20% to Blank, 20% to Miller and 20% to decedent, which documentation supported decedent's testimony. Rappaport testified that he capitalized Shelley with a transfer of funds from County and Premium, moneys derived from loans made by decedent, Blank, defendant and Miller.

The last corporation at issue, Zenith Services, Inc. (hereinafter Zenith), was incorporated in May 1961 as a successor to Premium Service Station, a partnership in which decedent, defendant and Miller each held a one-third interest. Goldstein prepared the incorporation documents but no shareholder agreement or corporate books were located. Rappaport testified that the accounting records showed the capital stock was credited 60% to defendant and 40% to decedent, Blank and Miller.

At trial, decedent essentially relied upon the corporate accounting records, tax returns and financial statements from over 20 years as the basis for his claim of ownership in interest

in the four corporations.[2] In refutation, defendant insisted that decedent was not a stockholder of any of the subject corporations, that decedent never possessed stock certificates and that there were no agreements to vest decedent with stock. Defendant claimed that any moneys received by decedent from the corporations were merely gifts or distributions, rather than payments or dividends made to a stockholder. Supreme Court determined that the proof established there was no issuance or transfer of stock to decedent nor any agreement to do so, and therefore declared defendant the sole stockholder of the four corporations. The court also found that defendant had not violated any fiduciary obligation toward decedent and denied any compensatory or punitive damages or other equitable relief to decedent.

On this appeal, plaintiff contends that res judicata and/or collateral estoppel barred Supreme Court from declaring defendant the sole shareholder of the four corporations, premised on orders or judgments in prior proceedings between the parties. Section 27 of Restatement (Second) of Judgments defines issue preclusion[3] as "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim". The applicability of collateral estoppel requires an identity of issue which has been decided in the prior action and is determinative of the instant action, and there must have been a full and fair opportunity to contest the issue on which the estoppel is sought (*see, Matter of Juan C. v Cortines*, 89 NY2d 659, 664; *Schwartz v Public Adm'r*, 24 NY2d 65, 71; *La Duke v Lyons*, 250 AD2d 969, 971-972; *Jung v Gemmette*, 249 AD2d 827, 829, *lv denied* 92 NY2d 807; *Lake George Park Commn. v Salvador*, 245 AD2d 605, 607, *lv dismissed, lv denied* 91 NY2d 939).

Plaintiff relies on prior Supreme Court and appellate decisions establishing decedent's shareholder status. In January 1977, decedent commenced a CPLR article 78 proceeding to compel Premium and defendant to permit inspection of the corporate books and records in accordance with Business Corporation Law § 624. Supreme Court granted decedent's mo-

**2.** At the end of decedent's proof, Supreme Court granted decedent's motion to amend the pleadings with regard to the sole ownership theory so as to conform to the proof of extent of ownership.

**3.** Plaintiff's theory is based on the principle of issue preclusion as opposed to claim preclusion to establish decedent's status as a stockholder, and therefore collateral estoppel is the appropriate doctrine.

tion for summary judgment in connection with this proceeding (*see, Blank v Premium Gas Serv.*, Sup Ct, Sullivan County, Apr. 11, 1977, Klein, J. [order], *affd* 59 AD2d 970). On defendant's motion for reargument, the court engaged in a detailed analysis of the documentary evidence presented by the parties and reaffirmed its holding that there was sufficient documentary evidence to permit the inspection based on its finding that decedent was a stockholder of at least 5% of Premium despite the absence of the issuance of a stock certificate (*see, Blank v Premium Gas Serv.*, Sup Ct, Sullivan County, June 3, 1977, Klein, J., at 10 [decision], *affd* 59 AD2d 970, *supra*). The court further considered defendant's request for an evidentiary hearing but found that it was unnecessary given Premium's and defendant's "failure to introduce evidence of equal caliber" (*see, id.*, at 12). Thereafter, this Court affirmed, citing the various documents from the record substantiating decedent's claim of stock ownership (*see, Matter of Blank v Premium Gas Serv.*, 59 AD2d 970, *supra*). In similar proceedings against Shelley and County, decedent was also granted the right to inspect corporate books and records, having made the requisite showing that he was a holder of at least 5% of outstanding capital shares of stock (*see, id.*; *Blank v Shelley Realty Corp.*, Sup Ct, Sullivan County, Apr. 28, 1981, Klein, J. [decision]; *Blank v Shelley Realty Corp.*, Sup Ct, Sullivan County, June 4, 1981, Klein, J. [order]; *Blank v Schafrann*, 129 AD2d 830, 831 [Levine, J., dissenting], *revd on dissenting mem below* 70 NY2d 887).

To controvert estoppel, defendant posits that a determination of decedent's stockholder status was not necessary to the prior adjudications and that no implication of stockholder status may be drawn from court decisions granting a right of inspection. We disagree. Business Corporation Law § 624 (b), (e) provided that "shareholders of record" and "any person holding * * * at least five percent of any class of the outstanding shares" shall be entitled to inspect corporate books and records. We find that Supreme Court in separate actions expressly provided that decedent was a shareholder of at least 5% of Premium, County and Shelley. This finding was clearly material and necessary in decedent's previous actions seeking the right of inspection. Moreover, in the context of a shareholder's derivative action, the Court of Appeals adopted Justice Levine's dissent which determined that "[i]n earlier litigation, plaintiff succeeded in establishing his status as a holder of at least 5% of the outstanding capital shares of stock of [Premium] * * * and two other corporations, entitling him to inspection of all corporate books and records" (*Blank v Schafrann, supra*, at

831 [citation omitted]). Our analysis of previous litigation between the parties reveals that defendant was afforded a full and fair opportunity to contest decedent's claims. We therefore find that collateral estoppel precluded a finding of defendant's ownership of 100% of the stock of Premium, County and Shelley.

Plaintiff also asserts that Supreme Court's decision was contrary to the weight of the evidence adduced at trial. At the onset, we recognize that the findings of the trial court should be accorded deference, especially where its findings depend upon the credibility of witnesses, unless it is obvious that its conclusions could not be reached under any fair interpretation of the evidence (*see, Hunt v Hunt*, 222 AD2d 759, 761; *Town of Dresden v Voutyras*, 244 AD2d 779; *Rocha Toussier yAsociados v Rivero*, 184 AD2d 397, 398). Here, plaintiff contends that Supreme Court failed to give proper consideration to the evidence other than the lack of stock certificates and written shareholder agreements.

It is well settled that this Court's power to review factual findings in nonjury cases is not limited to whether the trial court's findings were supported by credible evidence; rather, if it appears that a finding different from that of the trial court is not unreasonable, we must weigh the probative force of the conflicting evidence and the relative strength of conflicting inferences that may be drawn, and grant judgment as warranted (*Hunt v Hunt, supra*, at 761; *see, Town of Dresden v Voutyras, supra; Muller v State of New York*, 240 AD2d 881, 882). Since no certificates of stock were issued by the corporations, we may consider other evidence to determine the validity of decedent's claim (*see, Hunt v Hunt, supra*, at 760). Moreover, the mere fact that decedent was never formally issued stock certificates or that decedent did not physically possess stock certificates or a shareholder agreement, without more, is not dispositive of whether he was a shareholder (*see, Matter of C & M Plastics*, 194 AD2d 1020, 1022; *Matter of Benincasa v Garrubbo*, 141 AD2d 636, 638).

A review of the voluminous documents in evidence at trial reveals two distinct patterns of business dealings—one encompassing approximately 20 years of the Blank brothers' initial business dealings and another commencing in the mid-1970s as the relationship between the decedent and defendant deteriorated, culminating in the commencement of various lawsuits, including the instant matter. Notably, from the 1950s to the time of trial there were only two accountants, Bernard Ruderman from 1952 to 1955 and Rappaport thereafter, who

prepared the income tax returns and financial statements for the corporations, as well as the parties' personal returns. Rappaport testified that from 1962 through 1978, Federal and State corporate tax returns listed decedent and defendant as stockholders of the four corporations and indicated that no single person or entity owned 25% or more of the voting stock of any of the corporations. The parties' financial statements for many years also illustrated partial ownership by both parties, contained documentation for the creation of a profit-sharing plan and tax documents prepared in connection with the election of subchapter S tax status for County. Particularly relevant is Rappaport's memorandum of December 28, 1971 setting forth the ownership percentages of decedent, defendant, Blank and Miller for all four corporations, and the tax returns subsequent to that year listed these four individuals as shareholders for investment tax credit purposes. Additionally, various bank loan documents attributed shares to all four individuals. The documentary evidence continued in this vein until 1976 when defendant sent decedent correspondence claiming 100% ownership of Premium and County based on the buy-out arrangements with Laskin and Levine. In January 1977 decedent commenced this action and two years later, Miller's interests were purchased through a stock redemption agreement for $75,000.

It is undisputed that decedent received distributions from Premium from 1963 to 1973, until the subchapter S tax election was made. Even crediting defendant's assertion that he misunderstood the designations of these distributions, a myriad of corporate and personal tax returns, financial statements, bank applications, correspondence between the parties and other documents created a preponderance of credible evidence evincing plaintiff's interest as a stockholder in the subject corporations (*compare*, *Hunt v Hunt*, 222 AD2d 759, *supra*). The overwhelming consistency in the reference to the parties involved and the time span covered by the documentation cannot be ignored in contrast to the records created by defendant post-1976 after the brothers' relationship turned acrimonious. Defendant's contention that the paper trail showing ownership by decedent was simply a misunderstanding between himself and Rappaport is unavailing. Thus, upon our review of the entire record, we reverse Supreme Court's determination that defendant was the sole shareholder of the subject corporations.

With respect to the issue of whether defendant breached a fiduciary duty owed to decedent as a shareholder, this Court has established that "officers and directors of a corporation stand

in a fiduciary relationship to the corporation and owe their undivided and unqualified loyalty to the corporation, nor are they permitted to profit personally at the expense of the corporation" (*Howard v Carr*, 222 AD2d 843, 845). Defendant's status as a shareholder and officer of the corporations imposed a fiduciary responsibility to decedent as a shareholder. Rappaport's testimony revealed that in the late 1970s defendant acted in self-interest to maintain control of the corporations. For instance, the corporations were to buy out Miller's shares, including Miller's 20% interest in Shelley. Rappaport indicated that after Shelley began payments to Miller, defendant realized that he would control only the 40 shares he owned, equivalent to the 40-share interest held by Blank and decedent. To avoid this "stalemate", defendant modified the purchase agreement in 1980 to allow for his personal purchase of the Miller shares, thereby increasing his holdings to 60 shares and giving him a controlling interest in Shelley. We therefore conclude that defendant breached his duty owed to decedent as a shareholder and, hence, remit the matter to Supreme Court to determine decedent's interest in the four corporations and the amount of appropriate damages.

Cardona, P. J., Mercure, White and Spain, JJ., concur. Ordered that the order is reversed, on the law and the facts, without costs, and matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision.

